IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Respondent,　　　　　　　No. CR S-01-0071 LKK DAD P

    vs.

CHRIS OBIH UBAH,

    Movant.　　　　　　　　　FINDINGS AND RECOMMENDATIONS

_____/

        Movant is a former federal prisoner proceeding pro se with a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.[1]  Movant seeks post-conviction relief on the grounds that his trial counsel rendered ineffective assistance.  Upon careful consideration of the record and the applicable law, the court will recommend that the motion be denied.

BACKGROUND

I. Procedural Background

        In 2001, movant was charged in a four-count superseding indictment with one count of mail fraud and three counts of credit card fraud.  After a jury trial, movant was convicted on all counts.  On April 23, 2002, the district court sentenced movant to thirty-six

---

[1] This motion was assigned, for statistical purposes, the following civil case number: No. CIV S-04-1788 LKK DAD P.

months imprisonment on each count, to be served concurrently, and ordered him to pay restitution. Movant was also sentenced to a three year term of supervised release.

Movant filed a timely appeal raising several issues, including a claim of ineffective assistance of trial counsel. On September 22, 2003, the Ninth Circuit Court of Appeals affirmed his convictions but declined to address his claim of ineffective assistance of counsel, noting that the record on appeal was insufficient to permit full review of that claim. (Memorandum Opinion (docket # 129) at 5-6.) The instant motion was filed on August 27, 2004, seeking relief pursuant to 28 U.S.C. § 2255.

Movant was released from prison on November 17, 2003. (Government's Opposition to § 2255 Motion (Opp'n) at 3.) His supervised release term expired on November 16, 2006. (Report of Offender Non-Compliance (docket # 139) at 2.)

II. Factual Background[2]

### 1. Count One: Mail Fraud

In 2000, Ubah, a Sacramento area resident, was employed as an accounting officer in Sacramento by the California Department of Transportation ("CALTRANS"). R.T. at 592:1-17. In June 2000, Ubah caused a change of address notice to appear in the CALTRANS accounting department providing a new address for Western Pacific Specialities ("WestPac"), a former Arcata, California CALTRANS vendor that had ceased operating as a business around July 1997. R.T. at 250:7-23, 623:6-624:5; Ex. 42. The notice listed 2718 SE Kelley #235, Portland, Oregon, 97201, as Westpac's new business address. R.T. at 624:2-5; Ex. 42. Also around that time, Ubah caused a "vendor Data Record" to be submitted to the CALTRANS accounting department identifying "James McKenney" as WestPac's office manager and reflecting the Portland address. R.T. at 625:18-626:11; Ex. 51.

In Spring 2000, Ubah caused what purported to be a WestPac invoice, dated March 15, 2000, in the amount of $250,000 to be submitted to the CALTRANS accounting department for payment. R.T. at 630:10-13; Ex. 28. The invoice reflected WestPac's former

---

[2] The following factual summary is drawn from respondent's opposition to the § 2255 motion, at pgs. 3-10, and is reproduced here solely to provide a factual background with respect to movant's claims. The facts as related by respondent are fairly supported by the record and have not been challenged by movant in his pending motion.

contract number and purported to bill CALTRANS for work performed at a 120-gallon hazardous materials spill in Southern California in January 2000. R.T. at 627:17-18; Ex. 28. The invoice bore the words "Approved" and an illegible signature. Ex. 28.

In June 2000, the accounting department processed the invoice for payment with "spill number" 222067HSPILL. R.T. at 630:10-631:23. The "spill number" is a unique identifier generated by CALTRANS field personnel to designate a particular highway spill incident. R.T. at 559:8-20.

Spill number 222067HSPILL referred to a highway hazardous material spill in Southern California in October 1999 to which Ecology Control Industries ("ECI") had responded and for which ECI billed CALTRANS. R.T. at 563:1-654:15; Ex. 44. ECI performed work for CALTRANS under the same master contract as WestPac. Ex. 28, 44. The ECI invoice was approved by the appropriate CALTRANS hazardous materials manager and processed in the CALTRANS accounting department by Ubah. R.T. at 564:13-15, 617:9-13; Ex. 44. WestPac, however, did not respond to this hazardous material spill. R.T. at 565:20-22, 568:2-10. The approval signature on the WestPac invoice does not belong to either of the two hazardous materials managers authorized to approve invoices in that geographic area. R.T. at 564:18-565:1. The hazmat manager that approved the ECI invoice for spill number 222067HSPILL had no memory of the spill identified in the WestPac invoice and estimated that a 120-gallon spill would have resulted in a bill as low as $5,000 and as high as $25,000. R.T. at 570:2-12. A spill resulting in a cleanup bill of $250,000 likely would have involved a gasoline tanker or similarly large bulk liquid carrier holding 4,000 to 5,000 gallons. R.T. at 570:13-20. The hazmat manager could not recall such a spill on Interstate 5 in January 2000. R.T. at 570:21-571:9.

The fraudulent WestPac invoice, accompanied by the legitimate ECI invoice spill number, was processed by the CALTRANS accounting department in June 2000 and caused the State of California Controller's Office, on July 6, 2000, to issue a check in the amount of $250,000 made payable to "Western Pacific Specialtes [sic] Inc." R.T. at 432:9-10, 435:16-436:1; Ex. 35. The check was mailed to 2718 S.E. Kelly #235, Portland, Oregon, and deposited by "James McKenney" into a U.S. Bank checking account on July 22, 2000. R.T. at 365:11-13; Ex. 34.[3]

On June 17, 2000, an individual identifying himself as James McKenney, sole proprietor of Western Pacific Specialties, had opened a checking account at U.S. Bank in Portland. R.T. at

---

[3] The parties stipulated that the check was mailed on or about July 6, 2000.

3

354:6-16; Ex. 110. At that time, McKenney provided a nonexistent Portland address. R.T. at 794:18-20. On July 8, 2000, an individual identifying himself as James McKenney, sole proprietor of Western Pacific Specialties, using a fraudulent California driver's license, signed a second signature card for the U.S. Bank account changing his address to 2718 SE Kelly #235, Portland. R.T. at 354:24-355:8, 438:6-439:2; Ex. 31. This address corresponded to a private post office box. R.T. at 795:16-20.

Within three weeks of depositing the $250,000 check into the U.S. Bank account, "McKenney" had withdrawn over $33,000, and he had initiated a wire transfer of $140,000 to KNC Ventures. R.T. at 265:23-266:4; Ex. 29. "McKenney" attempted a second wire transfer on August 10, 2000, but an alert U.S. Bank employee recognized that McKenney's California driver's license was fraudulent and refused to authorize the transaction. R.T. at 303:11-21, 304:5-15, 309:8-11, 313:11-314:4.[4]

The $140,000 wire transfer was credited to the account of KNC Ventures at Diamond Bank, Lagos, Nigeria, on August 15, 2000. R.T. at 701:6-11. The sole signatory to the account was Ngozi Kamalu, Ubah's sister-in-law. R.T. at 697:21-22, 716:23-717:6, 721:23-722:2. Thereafter, Ubah's brother-in-law, C.U. Kamalu, made three cash withdrawals totaling $50,000. R.T. at 701:23-702:1, 703:24, 704:4; Ex. 115. On October 23, 2000, C.U. Kamalu transferred $88,600 from the KNC Ventures account controlled by his sister, Ngozi Kamalu, to his own account where the funds were converted into Naira, Nigeria's national currency. R.T. at 704:16-705:3; Ex. 115. C.U. Kamalu than withdrew 283,520 naira in cash, leaving 10,100,400 naira in the account. R.T. at 707:1-708:11; Ex. 116. The next day, C.U. Kamalu deposited additional funds into the account, and on October 26, he transferred 11,500,000 naira (approximately $97,000 US) into a fixed deposit account. R.T. 708:20-709:10; Ex. 116. On October 26, 2000, Diamond Bank issued a certificate of deposit to C.U. Kamalu documenting the 11,500,000 naira investment. R.T. at 709:16-710:5; Ex. 64.

When the fixed deposit account was liquidated on December 21, 2000, 11,677,093.61 naira (approximately $97,309 US) was withdrawn in the form of a cashier's check made payable to "Mr. C.O. Uba." R.T. at 713:22-714:17; Ex. 116. Ubah was in Nigeria from December 4, 2000, through January 20, 2001. R.T. at 853:1-13.

---

[4] Before refusing to authorize the transaction, the U.S. Bank employee obtained a second form of identification from "McKenney": a Southwest Airline credit card in the name of "James McKenney" which had been fraudulently obtained as a "second card" on an application fraudulently submitted on behalf of Alvin Greenberg, an identity theft victim from North Carolina. R.T. at 127:18-19, 128:1-131:15, 229:10-14.

4

Federal law enforcement agents executed a search warrant at Ubah's residence in February 2000 and found a piece of paper in Ubah's bedroom on which was written the address 2718 Southwest Kelly, Number 135, Portland, Oregon, 97201, the same address provided by James McKenney to CALTRANS and U.S. Bank with one error: the post office box number 235, not 135. R.T. at 824:15-825:5; Ex. 82. In addition, agents found handwritten notes corresponding to the three withdrawals from the C.U. Kamalu Diamond Bank account and exchange rate calculations for the $88,600 US originally deposited into the fixed deposit account. Ex. 99, 100. Agents also found stacks of Nigerian currency banded with Diamond Bank wrappers. R.T. at 880:9-881:22; Ex. 98. During the search, agents also found evidence indicating that Ubah, during his visit to Nigeria, had spent considerable sums of money on a home he was building in Nigeria. R.T. at 858:8-13, 869:7-10, Ex. 89-94. (Ubah described his home as a "palace" to his former girlfriend, Maureen Hunter. R.T. at 165:15-23.)

**2. Count Two: Credit Card Fraud**

During the execution of the search warrant at Ubah's residence, agents also discovered that Ubah had been engaged in credit card fraud using the identities of innocent individuals. Agents recovered a May 3, 1999, invoice from the Great Valley Chrysler Plymouth Jeep dealership in Sacramento for a purchase totaling $950.04. The invoice reflected the purchase of two absorbers for $33.50 each, a manifold for $215, and a "power uni" for $265, and other items. R.T. at 848:11-850:22; Ex. 22. Agents also recovered from Ubah's residence a handwritten list with the words "Plymouth Jeep," a telephone number, and an address at the top. The list is comprised of a number of car parts and prices, three with check marks beside them: "Manifold — $215.00," "Shocks – (b) Rear – $33.50," and "Brakes: – (a) Buster – $265.00." Ex. 76. The telephone number and address correspond to the telephone number for Great Valley as reflected on the invoice. Ex. 22, 76.

This purchase and various other purchases and cash advances are reflected on a First USA Bank[5] Visa credit card account fraudulently obtained in April 1999 in the name of Gary L. Wilson, 1185 Second Street, G1-103, Brentwood, California. Gary L. Wilson, who maintained his principle residence in Los Angeles, had not rented a private post office box in Brentwood, had not authorized anyone to do so on his behalf, and had not caused First USA Bank to issue credit cards in his name. R.T. at 216:1-222:3. During the execution of a search warrant of Ubah's residence, agents found on a piece of paper handwritten notes with Wilson's correct name and correct social security number listed. R.T. at

---

[5] At some point before trial of this case, Bank One was acquired by First USA Bank, N.A.

5

846:12-847:6; Ex. 75. Other information, including address, birth year (the birth date was correct), employment, and mother's maiden name were incorrect, but corresponded to the information provided to First USA Bank. R.T. at 220:1-17. The toll-free telephone number for First USA Bank was also written on the piece of paper. Ex. 75.

The total loss to First USA Bank from fraud involving this credit card was $22,692.39. R.T. at 244:12-14.

### 3. Count Three: Credit Card Fraud

Agents identified a second First USA Bank credit card fraudulently obtained in the name of Gary L. Wilson during the investigation. The information provided to First USA Bank in the application for this card was the same as that provided in the application for the card charged in count two. Ex. 16, 18. Among the charges on this account is a May 28, 1999, cash withdrawal of $900 made at the Arden Fair Mall. Ex. 17. On the same day, at Arden Fair Mall, a cash withdrawal of $900 was made from the First USA Bank credit card charged in count two. Ex. 19.

The total loss to First USA Bank from fraud involving this credit card was $8,366.79. R.T. at 244:12-14; Ex. 19.

### 4. Count Four: Credit Card Fraud

During the execution of the search warrant, agents also found a February 25, 1998, American Express credit card receipt for the purchase of $1,782.75 in BMW car parts from Niello BMW, a Sacramento BMW dealer, by Louis Werner. R.T. at 845:2-8; Ex. 4. This account was fraudulently obtained on January 26, 1998, in the name of Louis Werner, 1731 Howe Avenue, Number 404, Sacramento. R.T. at 137:19-139:1, 131:3-13. The Howe Avenue address corresponded to a private post office box acquired by Maureen Hunter, Ubah's former girlfriend, at his request, in the name of "Lakisha [sic] Jones." R.T. at 175:24-176:2. When she rented the private post office box on September 20, 1997, Hunter presented a California identification card and a fraudulent social security card in the name of "Lakeisha Jones." Ex. 3. Hunter obtained the California identification card from the Department of Motor Vehicles at Ubah's request. R.T. at 173:2-14. Ubah gave her the fraudulent social security card. R.T. at 173:23-174:7. Shortly after renting the private post office box, at Ubah's direction, Hunter added "Louis Werner" as an individual authorized to receive mail at the box. R.T. at 176:15-177:12.

Louis Werner, a resident of Missouri, had never lived in Sacramento, had never received mail at the Howe Avenue post office box, had not authorized issuance of the American Express card at issue, and had never purchased anything from Niello BMW.

6

R.T. at 207:7-209:24.  Ubah, however, was in the market for the items purchased with the fraudulent American Express card.  On February 24, 1998, the day before the purchase of car parts at Niello BMW, Ubah had his car serviced at Roseville BMW, a Sacramento area dealership, and was advised that further repairs were recommended.  R.T. at 192:16-194:2; Ex. 6.  Ubah declined the repairs, but obtained the part numbers of the items which needed to be replaced.  R.T. at 194:3-6; Ex. 6.  The part numbers identified for Ubah by Roseville BMW on February 24 were the parts purchased using the fraudulent American Express card a Niello BMW on February 25, 1998.  R.T. at 194:7-19; Ex. 6, 7.

American Express Card closed for collections (sic) in March 1998.  R.T. at 138:13-15.  The total loss to American Express from fraud involving this card was $2,284.25.  R.T. at 139:1.

## DISCUSSION

I. Applicable Law

Title 28 U.S.C. § 2255 provides, in part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

To support a claim of ineffective assistance of counsel, a movant seeking relief under § 2255 must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. 668, 688 (1984).  To this end, movant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id.  "There is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There is in addition a strong

/////

7

presumption that counsel "exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, movant must affirmatively prove prejudice. Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

II. Analysis

   A. Mootness

Movant has completed his term of imprisonment and is no longer under the supervision of federal officials because his supervised release term has expired. Accordingly, his motion should be denied as moot insofar as it attacks the validity of the sentence imposed against him. See Lane v. Williams, 455 U.S. 624, 632 (1982) (§ 2255 motion becomes moot when prisoner is released from custody prior to court consideration of merits); Robbins v. Christianson, 904 F.2d 492, 494 (9th Cir.1990), abrogated on other grounds by Spencer v. Kemna, 523 U.S. 1 (1998) (§ 2255 motion becomes moot upon prisoner's release from custody unless motion demonstrates adverse collateral consequences from challenged sentence or conviction). However, insofar as the pending motion challenges movant's judgment of conviction, it is not moot because a felony conviction has clear collateral consequences, such as interfering with the ability to obtain certain kinds of employment. See Lane, 455 U.S. at 632-34. Because the movant in this case challenges his conviction as well as his sentence, this court will address his claims on the merits.

   B. Ineffective Assistance of Counsel

Movant argues that his trial counsel rendered ineffective assistance by failing to request a jury instruction on eyewitness identification, failing to address the credit card fraud counts during closing argument at trial, and failing to challenge the testimony of a prosecution witness. The court will evaluate these claims in turn below.

### 1. Failure to Request Jury Instruction on Eyewitness Identification

Movant argues that his trial counsel rendered ineffective assistance by failing to request a jury instruction on eyewitness identification, when counsel had informed the jury that they would receive such an instruction. (Memorandum in Support of Motion (hereinafter P&A) at 1.) Movant contends that his trial counsel's mistake in this regard damaged counsel's credibility with the jury. (Id. at 2, Reply to Government's Opposition (Reply) at 4.) He also argues that such a jury instruction was necessary in this case because "eyewitness identification testimony compromised [sic] a major part of government's case, yet there were a number of reasons to reject their identifications." (P&A at 2-3.) Movant states that the jury instruction his trial counsel should have requested would have informed the jury as follows:

> In any criminal case, the government must prove beyond a reasonable doubt that the defendant was the perpetrator of the crime(s) alleged.
>
> You have heard testimony of eyewitness identification. In deciding how much weight to give to this testimony, you may take into account the various factors mentioned in these instructions concerning credibility of witness.
>
> In addition to those factors, in evaluating eyewitness identification testimony, you may take into account:
>
> 1. the capacity and the opportunity of the eyewitness to observed [sic] the offender based upon the length of time for observation and the conditions at the time of the observation;
>
> 2. whether the identification was the product of the eyewitness' own recollection or was the result of subsequent influence or suggestiveness;
>
> 3. any inconsistent identifications made by the eyewitness;
>
> 4. whether the eyewitness had known or observed the offender at earlier times; and
>
> 5. the totality of circumstances surrounding the eyewitness' identification.

(Reply at 3-4.)

/////

The trial record reflects that the prosecution presented the testimony of two employees from the U.S. Bank in Portland, who testified that they saw the man identified as James McKenney withdraw or attempt to withdraw funds from an account at the Portland bank. (Reporter's Transcript (RT) at 265-67, 276-78, 303-05.) One of these witnesses, Ms. Hammonds, selected movant's photograph from a photo lineup as the person who withdrew funds from the account at the Portland bank. (Id. at 276-78.) The other witness, Ms. Holden, was not able to identify movant from the photographic lineup as the person she saw in the bank. (Id. at 335-37.) However, she described the person she saw, stating, among other things, that he had a "dominating nose." (Id. at 330.) The prosecutor also presented the testimony of State Controller's Office Special Investigator Richard Moreno, who conducted the photo lineup with Ms. Hammonds and Ms. Holden. (Id. at 431, 461, 471-84.)

The prosecutor commented on the testimony of the two bank employees in her closing argument to the jury. Specifically, the prosecutor reminded the jury that Ms. Hammonds "picked Mr. Ubah out of a lineup" and "identified him without hesitation." (Id. at 1036.) With respect to the testimony of Ms. Holden, the prosecutor argued that the surveillance photographs were "not very good," and asserted that the description provided by Ms. Holden of the person who attempted to withdraw money from the bank matched the movant appearance. In this regard, the prosecutor argued:

> LaTanya Holden said that James McKenney had a large nasal structure, I think is the way she politely said it, and I can invite you to take notice of the defendant. No slight intended, but he has a large nose. That was something that she noticed and that she mentioned.

(Id. at 1036.)

During the closing argument to the jury by movant's counsel, the following brief discussion about jury instructions took place:

> [MOVANT'S COUNSEL]: And the Court will read you a jury instruction on identification and what it is you are to consider when you are considering eyewitness identification.

10

> Was the witness able to see, hear or know the things about which the witness testified? How good was the witness' memory? Was the witness' manner while testifying straightforward? Did the witness have an interest in the outcome?
>
> That's about witness [sic].
>
> Eyewitness testimony is, I hope, in here.
>
> THE COURT: I don't think you asked for an eyewitness ID.
>
> [MOVANT'S COUNSEL]: Okay. Eyewitness ID isn't in there.

(Id. at 1058-59.)

After acknowledging that a jury instruction on "Eyewitness ID" was not included in the packet of instructions, movant's counsel proceeded to discuss possible deficiencies or problems with eyewitness identification in general, and the eyewitness testimony in this case in particular. (Id. at 1059.) Defense counsel noted that "cross-racial identification is a problem." (Id.) He pointed out to the jury that Ms. Holden, who is African-American, was unable to identify movant as the person who was attempting to withdraw funds from the bank in Portland. (Id.) Defense counsel implied that Ms. Holden would not make a mistaken identification based on an inability to recognize different individuals of another race, as might Ms. Hammonds, who was the only witness to identify movant. (Id.)

Movant argues that his trial counsel's failure to ensure that the jury received an instruction on eyewitness identification constituted ineffective assistance of counsel under these circumstances. He first argues that such an instruction would have given the jury "reasons to reject" the testimony of Hammonds and Holden; "(e.g., failing to notice my scar or the fact that my hair and nose was different than Holden identified on McKenney)." (P&A at 3.) However, the record reflects that movant's trial counsel vigorously cross-examined both Hammonds and Holden, exploring the circumstances of the photo lineup procedures and the validity of their identification and their descriptions of movant. (RT at 283-97, 321-39.) Defense counsel thoroughly addressed these subjects during his closing argument to the jury. (Id. at 1059-60.)

Moreover, defense counsel highlighted the discrepancies between witness Holden's description of McKenney and movant's appearance at the time of his trial. (Id. at 1058, 1062.) Counsel questioned witness Moreno about the fact that Ms. Holden did not mention movant's obvious facial scar when she described Mr. McKenney to him. (Id. at 477-78.) Counsel also obtained Moreno's concession that, in his experience, there were "problems" with cross-racial identification, "but much less so when the witness and the subject they are identifying are of the same race." (Id. at 476.) In his trial testimony Moreno also agreed with defense counsel that Ms. Holden told him the person she saw in the bank "had a wider nose structure" than the person in the photo lineup. (Id. at 479.) These questions by movant's trial counsel, and the testimony obtained as a result, highlighted for the jury any weaknesses in the identification testimony of Ms. Hammonds and Ms. Holden. See United States v. Christophe, 833 F.2d 1296, 1300 (9th Cir. 1987) ("We adhere to the position that skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable").

Further, movant's jury was instructed regarding how to evaluate the testimony of witnesses such as Holden and Hammonds. Movant's trial counsel informed the jurors that they should consider whether the eyewitnesses could "see, hear or know the things about which the witness testified." (RT at 1058.) He also reminded the jurors to ask themselves whether the witnesses had a "good memory," whether their manner while testifying was "straightforward," and whether the witness had "an interest in the outcome." (Id.) Defense counsel's closing argument in this regard tied into instructions given to the jury by the court. In this regard, the trial judge instructed the jurors that in deciding whether to believe the testimony of any witness, they should consider:

> 1. Was the witness able to see, hear or know the things about which the witness testified?
>
> 2. How good was the witness' memory and was the witness able to testify clearly?

12

>    3.  Was the witness' manner while testifying straightforward and convincing or evasive and unconvincing?
>
>    4.  Did the witness have an interest in the outcome of the case or any bias or prejudice concerning anyone or anything that mattered in the case, and if so, did that interest or bias affect the testimony?
>
>    5.  How reasonable was the witness' testimony when you consider it in light of all the other evidence in the case?
>
>    6.  Was the witness' testimony contradicted by what that witness said or did at another time or by the testimony of other believable witnesses or evidence?
>
>    In deciding whether or not to believe a witness, remember that people sometimes forget things or sometimes get confused.

(Id. at 1096-97.) These instructions, although not identical to the instruction on eyewitness testimony that movant now claims should have been requested by his counsel, covered many of the same points.

Movant also argues that his trial counsel provided ineffective assistance because he lost credibility with the jury when he failed to follow up on his promise that they would receive an instruction on eyewitness testimony. This argument is based on pure speculation and is insufficient to establish prejudice. There is nothing in the record to suggest that the jury at movant's trial had a negative reaction to defense counsel's brief mention of a jury instruction on eyewitness identification, especially since they were later instructed regarding how to evaluate witness testimony in language almost identical to that used by movant's counsel in his closing argument.

In light of the above, movant has not demonstrated that the failure of his trial counsel to request a jury instruction on eyewitness testimony was prejudicial. As explained above, the jury was alerted by movant's counsel to problems inherent in eyewitness testimony and cross-racial identification. The eyewitnesses who testified at movant's trial were vigorously challenged with respect to the reliability and credibility of their testimony. The jurors were instructed by the trial court to view the testimony of all witnesses carefully. Much of the

substance of the jury instruction on eyewitness testimony that movant complains was omitted in error was in fact covered in the instructions actually given to the jury on witness credibility. In short, there is no reasonable probability that, but for trial counsel's error in neglecting to request a specific jury instruction on eyewitness identification, the result of the proceedings would have been different. Accordingly, movant is not entitled to relief on this claim.[6]

### 2. Failure to Address the Credit Card Fraud Counts During Closing Argument

Movant's trial counsel did not address the credit card charges against movant during his closing argument to the jury. Movant argues that his trial counsel's failure to address these charges constituted ineffective assistance of counsel because it effectively conceded movant's guilt on those charges. (P&A at 3.) He contends that the evidence on the credit card charges was "far from conclusive." (Id.) Movant notes that "no credit cards were found," "no eyewitness testified to seeing me with or using any of the cards," and "no fingerprint or handwriting evidence linked me to any of the credit cards applications." (Id.; Reply at 5.) Movant asserts that if his trial counsel had discussed these weaknesses in the government's case in his closing argument, movant would have received a favorable verdict on the credit card counts. (P&A at 3-4.)

In support of these arguments, movant cites the decision in United States v. Swanson, 943 F.2d 1070 (9th Cir. 1991). In Swanson, trial counsel affirmatively conceded in his closing argument that "there was no reasonable doubt that his client robbed the bank" and "inform[ed] the jury that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute." Id. at 1074. Under those circumstances, the Ninth

---

[6] In his reply brief, movant raises additional arguments concerning his trial counsel's "overall performance." (Reply at 2.) For instance, movant contends that his counsel failed to consult with him about his case, ignored his opinions, failed to answer his questions "adequately," failed to travel to Portland to interview witnesses Hammonds and Holden, and erroneously informed movant that Hammonds and Holden would not be called as witnesses at his trial. (Id. at 2-3.) Movant has failed to demonstrate that any of these alleged deficiencies in his counsel's performance resulted in prejudice to movant, as defined in Strickland. Accordingly, movant is not entitled to post-conviction relief on these claims.

Circuit concluded that trial counsel had "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," in violation of the defendant's Sixth Amendment rights. Id. (quoting United States v. Cronic, 466 U.S. 648, 659 (1984)).

      Trial counsel's decision in this case not to address the credit card fraud charges against movant in his closing argument does not rise to the level of a Sixth Amendment violation. Unlike the situation in Swanson, counsel's argument did not in any way concede movant's guilt. As suggested by respondent, counsel may have framed his closing argument to focus his presentation on the weaker mail fraud count. Such a tactical decision is a reasonable one given the evidence in this case, as set forth above, and does not support a claim of ineffective assistance of counsel. Strickland, 466 U.S. at 690 (reasonable strategic choices are "virtually unchallengeable"); see also Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable"). Moreover, movant has also failed to demonstrate a reasonable probability that the result of the proceedings with respect to the credit card fraud charges would have been different had counsel chosen to specifically address each of those charges in his closing argument.[7] Accordingly, movant is not entitled to relief on this claim.

### 3. Failure to Challenge the Testimony of a Prosecution Witness

      Movant next argues that his trial counsel rendered ineffective assistance when he failed to object to the testimony of a "surprise" prosecution witnesses on the grounds that certain documents relied on by the witness during his testimony had not been provided to the defense. (P&A at 4.) Respondent points out that the documents in question were, in fact, provided to

---

[7] Movant asserts that the prosecutor, in her rebuttal argument to the jury, emphasized the failure of defense counsel to argue the credit card counts in his closing argument. (Reply at 5.) The record reflects that the prosecutor's actual comment was: "Now, I'm really not going to talk about Counts Two, Three and Four, the credit card counts. I really don't have anything to respond to there so we'll just leave that." (RT at 1075.) This ambiguous comment in final argument did not specifically refer to or emphasize anything at all, and does not reflect that movant was prejudiced by his trial counsel's decision not to present specific argument on the three credit card counts during his closing argument.

defense counsel prior to the testimony of this witness. (Opp'n at 18-21.) Respondent also argues persuasively that the witness in question was mentioned in the government's trial brief and on a list of possible prosecution witnesses announced on the first day of trial. Movant does not dispute these facts, although he states that he did not see the documents himself. (Reply at 6.) Because movant's argument that the government witness in question was a "surprise" witness and that documents relied upon by the witness were not disclosed to the defense in a timely manner lacks a factual basis, movant is not entitled to relief on this claim.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that

1. Movant's August 27, 2004 motion to vacate, set aside, or correct his plea and sentence pursuant to 28 U.S.C. § 2255 be denied; and

2. The Clerk of the Court be directed to close the companion civil case No. CIV S-04-1788 LKK DAD.

These findings and recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: November 10, 2009.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
ubah71.2255